**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | : | |
| Plaintiff | : | Case No. |
| | : | 5:23-cv-44 |
| v. | : | |
| | : | |
| NORTH CAROLINA STATE UNIVERSITY, | : | |
| Defendant. | : | Electronically Filed |

## COMPLAINT

This case identifies an additional plaintiff in a recently discovered long-term pattern of sexual abuse in the athletics department of Defendant North Carolina State University. It alleges that Plaintiff, an NCSU student-athlete, was sexually assaulted by NCSU's Director of Sports Medicine, Robert M. Murphy, Jr., over an extended period. The University had a duty of reasonable care to protect Plaintiff from Murphy's assaults and did not heed a report from a coach about Murphy's aberrant behavior. NCSU created a hostile environment for Plaintiff and was deliberately indifferent when it failed to adequately respond to multiple coaches' actual knowledge of and one coach's report of Murphy's sexual abuse to an Athletic Director. NCSU thereby enabled Murphy to engage in additional assaultive behavior

1

towards Plaintiff, which was unlawful discrimination against Plaintiff on the basis of his sex in violation of Title IX.

Plaintiff John Doe, by and through his attorney, based upon knowledge of his own acts and upon information and belief as to the acts of others, respectfully alleges as follows:

## JURISDICTION AND VENUE

1.     Plaintiff brings this action to seek redress for discrimination based on sex by the Defendant, pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (1972). Accordingly, Plaintiff invokes this Court's federal question jurisdiction conferred by 28 U.S.C. § 1331, which gives district courts original jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

2.     Because this Court has jurisdiction to address the controversy before it, 28 U.S.C. § 2201 grants the Court authority to declare the rights of the parties before it, and 28 U.S.C. § 2202 authorizes the Court to grant such further relief, including injunctive relief, as the Court may deem necessary and proper.

3.     The pending Eastern District of North Carolina case of *Benjamin Locke v. NCSU et al*, file number 5:22-cv-344-FL, is connected to this action, in that

Plaintiff herein addresses a Title IX claim based on substantially similar underlying facts as alleged against Defendant NCSU in *Locke*. (L.R. 40.3)

4.     Defendant NCSU is a state-run public university and a constituent of the University of North Carolina System, organized and operating primarily in Wake County, North Carolina.

5.     Plaintiff John Doe is a resident of the United States of America.[1]

6.     Venue is proper in the Eastern District of North Carolina pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial portion of the events, acts, or omissions giving rise to Plaintiff's action occurred in Wake County, North Carolina.

## PARTIES

7.     Plaintiff John Doe was a male student-athlete at NCSU. Doe attended NCSU with an athletic scholarship. At all relevant times herein, Doe was enrolled as an NCSU student-athlete member of NCSU's NCAA Division I intercollegiate athletics program.

---

[1]     John Doe's state of residence is not named herein for his privacy and safety. Plaintiff's actual name is identified in a sealed document filing as allowed by L.R. 5.1(g) and F. R. Civ. P. Rule 10(a).

8.     Defendant NCSU is the largest campus in the University of North Carolina System's 16-campus state-run public university system, and is located in Raleigh, Wake County, North Carolina.

## APPLICABLE LAW AND POLICY

9.     Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

10.    Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106.

11.    "Title IX contains an implied private right of action permitting aggrieved parties to sue educational institutions for alleged violations." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 713 (1979); *Davis v. Univ. of N.C. at Greensboro* (M.D.N.C. 2020).

12.    "Title IX, in conjunction with 42 U.S.C. § 2000d-7(a)(1), represents Congress' expression of a 'clear, unambiguous, and unequivocal condition of waiver of Eleventh Amendment immunity.'" *Litman v. George Mason University*, 186 F.3d

4

544. "Thus, by accepting federal funding under Title IX, a state agrees to waive its Eleventh Amendment immunity." *Id.*; *Kirby v. N.C. State Univ.* (E.D.N.C. 2015).

13.    "The Supreme Court has held that sexual harassment, including coerced sexual intercourse, is sex-based discrimination. *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 63, 74-75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (finding that a teacher's repeated rape of a student on school property supported a Title IX claim, noting that sexual harassment is based on the victim's sex and thus constitutes sex-based discrimination)." *McClean v. Duke Univ.*, 376 F.Supp.3d 585 (M.D.N.C. 2019).

14.    State law determines the statute of limitations used in a federal law claim and North Carolina's three-year statute of limitations governs Plaintiff's claims under Title IX.

15.    Federal law determines when Plaintiff's federal law claims accrued. Discrimination claims accrue under the discovery rule "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc) (citing *United States v. Kubrick*, 444 U.S. 111, 122-24 (1979)). *See also McCarter v. The Univ. of N. Carolina At Chapel Hill* (M.D.N.C. 2021).

## FACTS COMMON TO EACH CLAIM FOR RELIEF

16.     All paragraphs of this pleading are incorporated herein by reference.

17.     Plaintiff was recruited by NCSU coaching staff and awarded an athletic scholarship to train and compete as a student-athlete in NCSU's NCAA Division I intercollegiate athletics programs.

18.     Plaintiff was a student-athlete at NCSU during Murphy's tenure as Director of Sports Medicine between 2012 and 2022.

19.     Plaintiff executed and submitted to the NCSU Athletic Department paperwork required of incoming student-athletes participating in NCSU athletics, including the "Shared Responsibility and Assumption of Risk" form on which Plaintiff agreed that it was the athlete's responsibility to "comply with directions" of coaches and Sports Medicine staff.

20.     NCSU Senior Associate Athletic Director Lester Sherard Clinkscales chaired the Athletics Department's 2011 search committee for a new Director of Sports Medicine.

21.     The Director of Sports Medicine position filled in December 2011 with the hire of Robert M. Murphy, Jr. who began his employment on January 4, 2012.

22.     Prior to being hired at NCSU, Murphy was employed at Mercer University in Macon, Georgia.

23.     Murphy was licensed by the North Carolina Board of Athletic Trainers Examiners[2] ("NCBATE") on December 14, 2011[3] and submitted to NCBATE the required "Licensed Athletic Trainer Protocol" outlining his authorized athletic trainer responsibilities and duties, naming NCSU as his Team/Organization, and providing the name and signature of the NCSU team physician who ostensibly had medical oversight of Murphy's work as a licensed athletic trainer.

24.     At all relevant times, Murphy was certified[4] by the National Board of Certification for Athletic Trainers.

25.     Murphy's duties at NCSU were to provide direct oversight and coordination of day-to-day athletic training, medical services operations, and sports

---

[2]     The North Carolina Board of Athletic Trainer Examiners is statutorily created and delegated with the authority to regulate the profession of athletic training in the interest of protecting the health, safety, and welfare of the public. With necessary oversight by the government, the Board enforces standards and criteria set forth in statute and adds specificity through the promulgation of regulations.

[3]     As of January 30, 2023, the status of Murphy's North Carolina Athletic Trainer License is listed in the NCBATE database at https://ncbate.org/search-athletic-trainers/ as "Summarily Suspended" and was scheduled to expire on January 31, 2023.

[4]     The status of Murphy's certification through the national Board of Certification for Athletic Trainers is listed in the BOC database at https://cert.bocatc.org/bocssa/ as "Suspended as of 09/27/2022."

medicine facility management for NCSU's 23 NCAA Division I intercollegiate sports teams and approximately 550 student-athletes.

26.     As Sports Medicine Director for intercollegiate sports teams, Murphy was in control of determining when or whether Plaintiff was allowed to compete based on his assessment of Plaintiff's health, injuries, and need for treatment.

**Murphy's Sexual Abuse of Plaintiff**

27.     Plaintiff was an NCSU student-athlete on an NCSU intercollegiate sports team.

28.     Doe experienced hip pain in 2015 which he reported to Murphy.

29.     Murphy told Plaintiff he would wrap Plaintiff's hip and thigh area with flexible bandages.

30.     Murphy wrapped male athletes' thigh, hip, and groin areas.

31.     Assistant athletic trainers only wrapped male athletes' extremities.

32.     Murphy directed Plaintiff into his private office in Room 2182 in the athletic training area at Weisiger-Brown Athletic Facility[5].

_____

[5]     NCSU's Weisiger-Brown Athletic Facility housed men's and women's locker rooms and shower facilities, the Sports Medicine Department and offices, and the Athletic Training Room used by both male and female student-athletes.

8

33.     The blinds on the office windows overlooking the training room and Murphy's office door were closed.

34.     Murphy directed Plaintiff to undress and watched as Plaintiff did so.

35.     Plaintiff felt uncomfortable undressing to get wrapped by Murphy but did not feel he could question Murphy and complied with his directions.

36.     Murphy commented on the relative size of Plaintiff's penis.

37.     Murphy used his bare hands and fingers to touch, hold, and/or move Plaintiff's genitals while wrapping Plaintiff's hip area.

38.     Murphy made skin-to-skin contact with Plaintiff's genitals

39.     Murphy did not ask for Plaintiff's consent to touch his genitals.

40.     Plaintiff did not consent to Murphy touching his genitals.

41.     Murphy had no legitimate medical need to touch Plaintiff's genitals.

42.     Plaintiff was uncomfortable with Murphy's contact with his genitals.

43.     Plaintiff communicated with a friend a number of times and shared his general discomfort with Murphy's behavior.

44.     Later that year, Plaintiff experienced back pain and reported it to his coach who then referred him to Murphy for treatment.

45.     Murphy examined Plaintiff and told him that his pain was "not in your back," but was from a tendon/muscle attached to his hip in his groin area and "that's where the pain is coming from."

46.     Plaintiff thought Murphy's statement was odd because Murphy had taken his complaint of back pain and turned it into a groin problem.

47.     Plaintiff had previously been treated by Murphy with sports massage and was aware that Murphy treated many male athletes with groin issues using sports massage to the extent that student-athletes were lulled into believing Murphy's groin area massages were common practice in the culture Murphy created in the Sports Medicine Department.

48.     That weekend, Plaintiff arrived in the training room so Murphy could work on his injury and found that no other athletes, trainers or staff were present.

49.     Murphy directed Plaintiff to remove his compression shorts from under his loose practice shorts.

50.     Murphy attempted to remedy Plaintiff's back pain with sports massage on his groin area.

51.     Plaintiff complied with Murphy's directions and trusted that Murphy was acting in his best medical interest as the Director of Sports Medicine.

52.     Murphy told Plaintiff he couldn't reach or "get to" the problem area and directed Plaintiff to get on his knees or "on all fours" on the training table.

53.     Plaintiff thought this direction was strange but did as he was directed by repositioning himself, so he was on his hands and knees on the training table.

54.     Once Plaintiff was on his hands and knees, Murphy reached his left hand between Plaintiff's legs from behind and placed it inside his shorts on his groin next to his genitals, and from Plaintiff's right side Murphy placed his right hand inside Plaintiff's shorts on his groin very close to his genitals.

55.     Murphy then moved his left hand inside his shorts from between Plaintiff's legs to a position behind Plaintiff and placed one finger over Plaintiff's anus while Murphy's right hand was on his genitals.

56.     Plaintiff was frozen into inaction at that moment and was unable to speak or react in any way.

57.     Murphy moved his hands in a feeling motion that Plaintiff knew could not be a legitimate massage technique for a few seconds.

58.     Murphy made skin-to-skin contact by touching, rubbing, holding, and/or moving Plaintiff's groin, penis, testicles and anus with his bare hands and fingers, without asking for or receiving Plaintiff's consent, and without any legitimate medical need.

59.     Plaintiff got off of the training table, went to the locker room, dressed, removed everything from his locker, and went back to his apartment to shower.

**Immediate Harm to Plaintiff's Health and Well-Being**

60.     Plaintiff had doubts that Murphy's skin-to-skin contact with his genitals and anus was a professionally acceptable athletic training technique for a licensed athletic trainer.

61.     Plaintiff convinced himself that he was over-reacting to what Murphy had done due to instilled confidence and trust in Murphy's elevated professional stature at NCSU and the requirement as an NCSU student-athlete that he follow Murphy's directions.

62.     Plaintiff only went to the training room for treatment of wrist or ankle injuries, team required ice baths, or chiropractic provider appointments, and stayed away from the training room as much as possible for the rest of his time at NCSU.

63.     Plaintiff did not allow Murphy to treat him when he needed assistance from the Sports Medicine Department trainers.

64.     Plaintiff's opportunities to participate in his sport and other athletic and educational programs and activities at NCSU were diminished by Murphy's sexual abuse through Plaintiff's:

a. Discomfort with the requirement that he comply with Murphy's directives;

b. Lack of confidence in the appropriateness of the services offered by Murphy and through the Sports Medicine Department;

c. Reduced access to necessary athletic training facilities due to his efforts to avoid interacting with Murphy;

d. Diminished enjoyment of the sport he had spent a good portion of his life mastering; and

e. Increased levels of unease and self-doubt leading to decreased focus, attention and academic successes in his coursework.

## Discovery of Relevant Facts Regarding Murphy

65.    Plaintiff first became aware a civil suit had been filed by Benjamin Locke naming NCSU and Murphy as defendants in September 2022.

66.    When Plaintiff saw the *Locke v. NCSU et al* civil complaint, Plaintiff learned for the first time of the following factual allegations made by Locke that are related to his own abuse by Murphy at NCSU, and that Plaintiff did not know and could not reasonably have known before that time:

a. Before 2016, NCSU Head Soccer Coach Kelly Findley became aware that Murphy was engaging in what he suspected was sexual grooming of male student-athletes;

b. In early 2016, Findley told Senior Associate Athletic Director Sherard Clinkscales, that Murphy was engaging in what he suspected was sexual grooming of male student-athletes;

c. Murphy's duties as Director of Sports Medicine were changed to be more "administrative" on August 1, 2017;

d. Murphy was removed as the designated athletic trainer for certain men's teams on August 1, 2017;

e. Murphy was promoted to Associate Athletic Director and given a raise in 2018;

f. In the spring of 2022, nine witnesses were interviewed by NCSU in a Title IX investigation into Locke's report about Murphy, including at least three male student-athletes from different sports;

g. One or more male student-athletes corroborated Locke's claims with their own claims of being sexually abused by Murphy;

h. Two or more assistant athletic trainers were interviewed in the Title IX investigation and told the investigators that:

14

i. Avoiding skin-to-skin contact with student-athletes' genitals is part of every professional training;

ii. Directing student-athletes to remove their underwear or compression shorts is not an acceptable practice for a licensed athletic trainer; and

iii. Applying athletic wraps over student-athletes' underwear or compression shorts was their common practice.

i. Murphy participated in a single interview with the Title IX investigators on January 21, 2022 and declined to participate in additional interviews.

j. Murphy told the Title IX investigators that it was his personal preference to apply athletic wraps on "the bare skin" instead of over student-athletes' underwear or compression shorts;

k. Murphy admitted to the Title IX investigators that he had touched Locke's penis and testicles with his bare hands.

l. As recently as the fall semester of 2021, Murphy conducted drug testing for male student-athletes wherein Murphy required each student-athlete being tested to remove their underwear or compression shorts and place the front hem of their shirt in their

mouth. While directly observing their genitals, Murphy then escorted each athlete to a urinal to provide a urine specimen in a cup.

67.     In December 2022, Plaintiff first became aware of an allegation that Murphy used the identical drug-testing protocol at Mercer University in Macon, Georgia, to wit, he told each athlete to remove their shorts and put the hem of their shirt in their mouth to expose their penis while Murphy stared at the athlete's penis throughout the sample collection process.

68.     Before he saw the *Locke* complaint for the first time in September 2022, Plaintiff did not know, could not reasonably have known, and only after reviewing the *Locke* complaint became aware that:

   a.   On June 7, 2022, Locke was told by NCSU Title IX Coordinator Sheri Schwab that "Rob is no longer with the University."

   b.   On June 17, 2022, Locke received a "Notice of Investigative Finding" letter from the NCSU that stated:

> A finding has been rendered in which a violation of NC State Policy 04.25.05[6] would have been substantiated via the preponderance of the evidence standard if [Murphy] was still an employee at the university. … [T]he [Athletics D]epartment is responsible for

---

[6] The archived version of NCSU Policy 04.25.05 (Effective September 20, 2013 through July 18, 2018, the time period covering Locke's allegations) outlines the University's Equal Opportunity and Non-Discrimination Policy.

reviewing the report and determining the appropriate action to take.

c. On June 23, 2022, Schwab told Locke that Murphy's departure was an "involuntary separation" that was unrelated to Locke's case and that nothing regarding Locke's complaint, the investigation, or the finding was reflected in Murphy's employment record; and that Schwab also told Locke "we would have fired [Murphy], but he's no longer an employee so we can't."

d. On July 26, 2022, Locke was allowed time-limited electronic-only viewing access of the 923-page Title IX Final Investigation Report and saw that:

   i. The names of the student-athlete witnesses interviewed in early 2022 were redacted, ostensibly pursuant to FERPA;

   ii. The names of all other non-student witnesses were redacted;

   iii. The full interview transcripts of all witnesses, including the transcript of Findley's interview in which he said he told Associate Athletic Director Clinkscales about Murphy's grooming behavior, were redacted; and

   iv. Murphy's full interview transcript was redacted.

e. In the heavily redacted NCSU Final Investigation Report, Locke learned for the first time that the NCSU Title IX investigators made the following determinations:

    i. It was "determined by a preponderance of the evidence that Locke's accounts of the events in question [were] more credible than Murphy's and Murphy's conduct towards Locke [was] determined to be unwelcome and of a sexual nature";

    ii. "In examining the totality of the evidence gathered in [the Title IX] investigation, Locke's detailed description of the shower incident tends to support that it did occur";

    iii. "Facts that tend to show severity in this case include that Locke was not in a position to question the conduct, that Locke relied on Murphy as an authority and professional in administering treatment, and that Murphy's physical contact with Locke's genitalia, based on the treatment he was receiving, would not have been medically necessary." And therefore it was "determined via a preponderance of the evidence standard that Murphy's conduct was sufficiently severe";

iv. "A single instance of nonconsensual contact to student-athlete's genitalia by an athletic trainer without a showing by the trainer that such contact was appropriate under the circumstances is considered severe; for such conduct to continue over the course of two years is also pervasive." … "Therefore, … it is determined via the preponderance of the evidence standard that Murphy's conduct was pervasive";

v. "[I]t is determined by a preponderance of the evidence standard that Murphy's conduct limited Locke's ability to participate in playing soccer which is an NC State activity";

vi. "[I]t is determined by a preponderance of the evidence standard that Murphy's conduct created an intimidating, threatening, or abusive educational environment"; and

vii. "[I]t is determined by a preponderance of the evidence standard that Murphy's conduct was subjectively and objectively offensive."

**Discovery of NCSU Actions and Inactions Related to Plaintiff**

69.    In September 2022, Plaintiff first became aware that other coaches in the NCSU athletics department were aware of Murphy's sexual grooming behaviors towards student-athletes in 2015, had discussed it amongst themselves, and although none had personally reported it to Title IX staff as required by NCSU policy, they were aware that Findley had reported it to Clinkscales.

70.    Before seeing the *Locke v. NCSU et al* complaint in September 2022, Plaintiff did not know, could not reasonably have known, and had no way of discovering the detailed information about NCSU's actions and inactions as outlined in the *Locke* complaint, that Locke had only learned for the first time in July 2022.

71.    Plaintiff did not know and could not reasonably have known that he was injured by NCSU's actions and inactions, or how he was injured by NCSU until September 2022, when he saw the *Locke* complaint.

**Plaintiff's Continuing Harms**

72.    Plaintiff actively avoided thinking about and suppressed thoughts of Murphy's sexual abuse for a number of years.

73.    In early 2022, Plaintiff became aware that Murphy was suspended over allegations of sexual abuse.

20

74.     Plaintiff began reflecting on his experiences with Murphy at NCSU.

75.     Plaintiff experienced feelings of fear, shame, humiliation, guilt, self-blame, self-doubt, distrust, anger, confusion, and sadness, long before he was able to connect those feelings to the sexual abuse committed by Murphy.

76.     Murphy's abuse and the severe anxiety it caused negatively impacted Plaintiff's personal and professional relationships, his physical and mental well-being, and his ability to trust others.

77.     Plaintiff attempted to deal with those feelings on his own, albeit unsuccessfully, and only in 2022 did he finally seek professional psychological counseling to help him come to terms with the trauma of Defendant's abuse and the suffering it had caused him.

78.     Plaintiff became aware in September 2022 that the NCSU Title IX investigation of Murphy prompted some people to make false and damaging statements about Locke to others in the NCSU athletic community as well as in the broader NCSU community and sports world, causing Plaintiff substantial fear of incurring similar retribution upon the filing of this complaint.

79.     Plaintiff's concerns about the impact such false and damaging statements may have on his personal well-being and reputation, and on his

immediate family were magnified when he learned Locke had also been subjected to direct personal harassment via electronic communications after he filed his suit.

80.    Plaintiff did not realize – until he later experienced legitimate treatment by other licensed athletic trainers – how professionally aberrant and abhorrent Murphy's conduct had been.

81.    Plaintiff struggled with a growing realization that he had unwittingly been groomed and sexually abused by Murphy while he was at NCSU.

**Plaintiff's Recognition that NCSU Caused His Harm**

82.    Plaintiff did not know and could not reasonably have known before seeing the *Locke* complaint in September 2022 that NCSU's failure to comply with federal Title IX regulations and NCSU non-discrimination policies when Findley reported Murphy's conduct, enabled Murphy to pursue a campaign of sexual abuse against Plaintiff and others unencumbered by any university oversight, thereby fostering a hostile environment for Plaintiff at NCSU, the effects of which plague Plaintiff to this day.

83.    Plaintiff did not know and could not reasonably have known before seeing the *Locke* complaint in September 2022 of the individual and collective failures of NCSU and its agents to:

a.  Fully comply with NCSU's anti-discrimination policies when Findley and other coaches became aware of Murphy's behavior;

b.  Comply with NCSU's anti-discrimination policies after Findley reported Murphy's behavior to Clinkscales;

c.  Investigate Findley's knowledge and report in a timely and meaningful manner to include speaking with other coaches familiar with Murphy's conduct; and that

d.  Such failures of NCSU's processes enabled Murphy to commit further sexual assaults, batteries and other tortious behavior after Findley and other coaches first became aware of it; and that

e.  NCSU's deliberate indifference to the coaching staff's actual knowledge of Murphy's conduct in 2015 allowed Murphy the freedom to sexually abuse Plaintiff and others with impunity thereafter.

84.    As a direct result of Plaintiff being sexually assaulted by Murphy when he was a student-athletes at NCSU, Plaintiff:

a.  Was subjected to a hostile environment in NCSU programs and activities, to wit, in NCSU's NCAA Division I intercollegiate sports and sports medicine programs; and

b. Has suffered from a lack of concentration and a decreased ability to perform educational and work assignments due to the enormous distraction caused by processing and coming to terms with Murphy's sexual abuse;

c. Has suffered stress and anxiety causing a negative impact on his physical health and well-being; and

d. Has suffered feelings of depression, severe anxiety, despair, fear, humiliation, confusion, distrust, and lack of self-confidence, as well as feelings of intense grief at the loss of friendships, and feelings of betrayal by former friends, teammates, peers, and medical professionals.

85. Defendant's actions effectively excluded Plaintiff from, denied him the benefits of, and subjected him to discrimination based on sex in NCSU intercollegiate athletic department programs, events, and activities that he had previously participated in, benefitted from, and enjoyed as an active and former NCSU student-athlete.

## COUNT I
## Violation of Title IX
## (Hostile Educational Environment)
## 20 U.S.C. § 1681, et seq.

86.     All Paragraphs of this pleading are incorporated herein by reference.

87.     Title IX prohibits discrimination on the basis of sex in a school's educational programs or activities, which include all of the school's operations. 20 U.S.C. §§ 1681(a), 1687.

88.     NCSU receives federal grant funding and has students who receive federal student financial aid, and thereby is a recipient of federal funds and must comply with Title IX.

89.     A victim of discrimination based on his sex has a private right of action under Title IX against the offending school for monetary damages and equitable relief.

90.     Plaintiff was a scholarship student-athlete and a member of an NCSU-sponsored, intercollegiate team, and therefore Plaintiff had a special relationship with Defendant NCSU.

91.     Defendant owed an affirmative duty of reasonable care as a matter of law to student-athletes including Plaintiff.

92.    Defendant had a duty to Plaintiff to provide him with a safe environment in which he would be free from sexual harassment, particularly from members of the athletics department staff.

93.    Defendant knew or should have known and/or had actual knowledge that:

   a.   Multiple coaches were aware of Murphy's sexual grooming behaviors towards student-athletes in 2015, had discussed it amongst themselves, and although none had reported it to Title IX staff as required by NCSU policy, they were aware that Findley had reported it to Clinkscales.

   b.   Murphy exercised oversight of assistant athletic trainers and the quality of their work on student-athletes, but that no individual in the athletics department or any NCSU team doctor exercised actual oversight of Murphy and the quality and/or appropriate nature of his work on student-athletes;

   c.   Murphy performed sports massages on male student-athletes or wrapped them while he was alone with them in the training room or in his office with the blinds closed and door shut;

d. Murphy did not wear gloves to work on student-athletes and made skin-to-skin contact while massaging their groin areas with his hands;

e. Murphy directed male student-athletes to remove their pants, shorts, compression shorts, and/or underwear before wrapping or massaging their hip, thigh, and groin areas;

f. Murphy loitered in the men's locker room and shower areas while male student-athletes were dressing, undressing, and/or showering without any legitimate reason related to his work; and

g. Murphy engaged in other conduct and in other ways contrary to professional athletic trainer best practices that will be shown at trial of this action.

94. Defendant undertook a duty to provide Plaintiff with appropriate, safe, and professional athletic training services by creating a Sports Medicine Department.

95. Defendant undertook a duty to provide Plaintiff with appropriate, safe, and professional athletic training services by hiring a North Carolina licensed athletic trainer as Director of Sports Medicine to oversee and manage the operations of the Sports Medicine Department.

96.     Murphy is alleged to have sexually abused one or more student-athletes at Mercer University before his tenure at NCSU began in 2012.

97.     Benjamin Locke was a student-athlete who alleges he was sexually abused and harassed by Murphy in early 2015 and afterwards.

98.     Murphy is alleged to have performed some of his duties at NCSU in an inappropriate sexual manner as late as December 2021 just before his employment at NCSU abruptly ended in January 2022.

99.     Plaintiff contends Murphy committed multiple acts of sexual assault against him during the time period Plaintiff was enrolled as a student-athlete during Murphy's employment at NCSU.

100.    Murphy was an Assistant Athletic Director and the Director of Sports Medicine from 2012 until 2018, when he was promoted to Associate Athletic Director and Director of Sports Medicine.

101.    Murphy took advantage of the extraordinary imbalance of power and privilege between himself and Plaintiff, an injured and vulnerable teen-aged athlete, to engage in a course of action by sexually abusing him.

102.    Murphy's sexual abuse created a hostile environment for Plaintiff at NCSU in that it caused Plaintiff to blame himself for Murphy's conduct and distrust his own feelings and boundaries, and it unmoored him from his previously held trust

and confidence in the benign benevolence of NCSU, the athletic department hierarchy, and in the general good faith of medical professionals.

103.   Murphy's sexual abuse created a hostile environment for Plaintiff at NCSU that unreasonably interfered with his athletic team participation and athletic performance through under-treated injuries, and his participation in educational programs and activities through its grossly unsettling impact on his youthful psyche which resulted in a deleterious effect on his classroom focus, course grades, and educational success.

104.   Murphy's sexual abuse created a hostile environment for Plaintiff at NCSU in that it created an intimidating and offensive environment that caused Plaintiff to be constantly fearful of further sexual abuse by Murphy.


## COUNT II
### Violation of Title IX
### (Deliberate Indifference)
### 20 U.S.C. § 1681, et seq.

105.   All Paragraphs of this pleading are incorporated herein by reference.

106.   Defendant had a duty to act in good faith in responding appropriately to Findley's report of Murphy's alleged sexual abuse.

107. Multiple NCSU coaches and responsible employees were aware of Murphy's sexual grooming behaviors towards student-athletes in 2015, discussed it amongst themselves, and none of them reported Murphy's suspected sexual harassment of student-athletes to Title IX staff as required by NCSU policy.

108. NCSU did not address or inadequately addressed Findley's report to Clinkscales that he believed Murphy was grooming student-athletes for sexual purposes.

109. Clinkscales either disregarded Findley's report or concealed it from NCSU's administration and Title IX Coordinator.

110. Findley possessed information he deemed serious enough to report to Clinkscales, and in that Findley as a coach was a responsible employee, his knowledge of Murphy's conduct effectively conferred actual notice of the conduct to NCSU.

111. Other NCSU coaches possessed information they deemed serious enough to discuss among themselves, and in that each of those coaches was a responsible employee, their knowledge of Murphy's conduct effectively conferred actual notice of that conduct to NCSU.

112. Defendant's actions and inactions after NCSU received actual notice of Murphy's conduct via Findley and the other coaches in 2015, were unreasonable in

light of the substance of Findley's and the other coaches' knowledge and the known circumstances of Murphy's unfettered access to male student-athletes, and those actions and inactions thereby allowed Murphy to engage in subsequent acts of sexual abuse against Plaintiff.

113.  Clinkscales' decision not to share Findley's report of Murphy's conduct with the Title IX Coordinator as required by NCSU policy was a transparent attempt to preserve the status quo and to avoid negative professional consequences in NCSU's Athletics Department.

114.  NCSU had actual notice of sexual harassment by Murphy in 2015, took no action or inadequate action to end it, and Murphy subsequently sexually assaulted Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against Defendant as follows:

115.  Compensatory damages for Plaintiff's psychological and emotional distress and damages, and his out-of-pocket expenses incurred in response to these circumstances;

116.  Interest on the damages awarded;

117.  Costs; and

118.  Reasonable attorney fees pursuant to 42 U.S.C. § 1988.

119.  Plaintiff further requests that all issues complained of herein be tried by a jury.

Respectfully submitted and filed this the 1st day of February, 2023.

KERSTIN WALKER SUTTON PLLC

_____
Kerstin Walker Sutton
Durham, NC
(919) 698-9555
kws@kwsutton.com
NC State Bar No. 30008

## CERTIFICATE OF SERVICE

I certify that on February 1, 2023, I caused a true and correct copy of the foregoing Complaint filed through the ECM/CF system to be served upon Defendant NCSU pursuant to Fed. R. Civ. P. 4.

_____
Kerstin W. Sutton
Counsel for the Plaintiff

KERSTIN WALKER SUTTON PLLC
3215 Deerchase Wynd
Durham, NC 27712-3020
(919) 698-9555
kws@kwsutton.com
NC 30008